[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 19, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13359

_____

BIA No. A97-134-139

JEAN HEROLD JEAN-PIERRE,
a.k.a. Jean Harold Pierre,
a.k.a. Martina Jean Pierre,
a.k.a. Jean Pierre Jeanherold,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(September 19, 2007)**

Before ANDERSON, MARCUS  and COX, Circuit Judges.

MARCUS, Circuit Judge:

    More than fifty years ago, Justice Frankfurter wrote that, when it comes to

torture, "there comes a point where this Court should not be ignorant as judges of what we know as men." Watts v. Indiana, 338 U.S. 49, 52 (1949). Today, we decide not whether our humanity should inform our understanding of torture, but whether, in the context of this claim, Congress has eliminated the jurisdiction of the federal courts to address this issue in the first place. We conclude that the question at the heart of this appeal -- whether a particular course of conduct amounts to torture under the Convention Against Torture[1] and the accompanying legislation -- is a legal one, and accordingly falls squarely within our limited jurisdiction under the REAL ID Act of 2005.[2]

Petitioner Jean Herold Jean Pierre ("Jean Pierre"), a gravely ill AIDS patient, claims that he will be tortured in jail if he is removed to Haiti as a criminal alien. He has consistently said, without any dispute, that he will be beaten with metal rods, confined for weeks in a tiny crawl space, and subjected to the Haitian practice of "kalot marassa" (severe boxing of the ears). This conduct, he argues, is torture. Because the Board of Immigration Appeals failed to consider the heart of these claims, we grant his petition for review, vacate the BIA's decision, and remand for further proceedings.

---

[1] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, § 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

[2] REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 302 (codified in scattered sections of 8 U.S.C.).

I.

A.

Jean Herold Jean Pierre, a Haitian citizen, entered the United States in August 1992 on a temporary visa that expired in 1993. Thereafter, Jean Pierre was convicted of violating Florida's drug laws in 1995, 1997, and again in 2004.[3] In 2005, while Jean Pierre was serving a two-year sentence in a St. Lucie County jail on his third controlled substance conviction, the Department of Homeland Security began removal proceedings against him pursuant to 8 U.S.C. § 1227. This section of the immigration laws provides that any alien convicted of certain crimes, including the drug crimes committed by Jean Pierre, is deportable upon the order of the Attorney General. See 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); id. § 1227(a)(2)(B)(i) ("Any alien who at any time after admission has been convicted of a violation of . . . any law or regulation of a State . . . relating to a controlled substance . . . is deportable."). Claiming that he will be tortured if he is sent to Haiti, Jean Pierre sought withholding of removal under the Convention Against

---

[3] Jean Pierre pled guilty to cocaine possession on April 11, 1995. He was sentenced to five days in jail and two years of probation. R. 1488–93. On June 16, 1997, he was convicted of cocaine possession and sale and sentenced to six months in prison. R. 1464–66. Finally, on March 26, 2004, Jean Pierre was charged with possession with intent to sell or deliver cocaine, use or possession of drug paraphernalia, and possession of 20 grams or less of cannabis. R. 1314. Following a plea of nolo contendere, he was sentenced by the state court to 24 months imprisonment. R. 1316.

Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") art. 3, § 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.

These basic facts are undisputed. Jean Pierre has AIDS. While in United States custody, he has received life-saving medication, but the virus continues to ravage his body. He is infected with cytomegalovirus, an infection dangerous in immunocompromised individuals. The infection has caused him to go blind in his left eye. He frequently suffers from headaches, fevers, and memory impairment; he often becomes terrified when he awakens to hallucinatory visions of big snakes or walls falling over. Jean Pierre claims that being deported to Haiti will amount to a death sentence, and will be the same as if someone "put a gun to his head and shot him." R. at 188. In fact, he testified that he would prefer this quick death to being deported.

Although Jean Pierre has served his sentence for violating Florida's drug laws, criminal deportees from the United States are subject to indefinite detention in Haitian prisons upon their return to Haiti. R. at 190. No one disputes that the conditions in Haitian prisons are appalling. According to the State Department, prisoners in Haiti suffer from a lack of basic hygiene, malnutrition, and inadequate or nonexistent health care. U.S. State Dep't, Country Reports on Human Rights Practices - 2004 - Haiti (Feb. 28, 2005). Infectious disease flourishes in the

4

overcrowded facilities, and even basic supplies such as water are limited. Id. In no small measure, the prisoners' suffering is undoubtedly a consequence of the fact that Haiti is the poorest country in the Western Hemisphere. See In re J-E-, 23 I. & N. Dec. 291, 301 (BIA 2002) (en banc) ("The record establishes that Haitian prison conditions are the result of budgetary and management problems as well as the country's severe economic difficulties.").

Poverty is not, however, the only problem. According to the State Department, Haitian prison guards sometimes beat prisoners with fists, sticks, and belts, and we have previously acknowledged that "certain isolated, vicious and deliberate acts, such as burning with cigarettes, choking, hooding, kalot marassa [severe boxing of the ears, sometimes leading to eardrum damage], and electric shock do occur in Haitian prisons." Cadet v. Bulger, 377 F.3d 1173, 1194 (11th Cir. 2004).

Jean Pierre argues that Haitian jailors will single him out for especially harsh treatment because of his HIV infection and accompanying mental illness. In support of this claim, Jean Pierre presented materials specific to the treatment of AIDS-infected persons in Haiti, including information from the U.S. Centers for Disease Control and Prevention, reports from public health organizations, newspaper articles describing the stigmatization of AIDS patients, and testimony from a number of experts. Thus, for example, Jean Pierre pointed to the State

5

Department's Country Report on Haiti, which says that "[s]ocietal discrimination occurred against persons with HIV/AIDS." 2004 Country Report. Jean Pierre also produced an affidavit from Dr. Paul Farmer, a professor at Harvard Medical School and founder of Partners in Health, an international public health organization with extensive operations in Haiti. Farmer's affidavit describes "the terrible social stigma associated with the virus" and the fact that "discrimination and abuse against poor Haitians with HIV/AIDS is a strong reality in Haiti." R. at 424–26.

Jean Pierre also presented testimony from Chandra Kantor, a nurse practitioner who estimated that, if deported to a Haitian prison, Jean Pierre would likely develop a life-threatening disease within a month or two and die shortly thereafter. This testimony was supported by Stacy Graziosi, an "intensive adherence specialist" in HIV/AIDS who began monitoring Jean Pierre's treatment regimen in 2002. She opined that Jean Pierre's AIDS-related complications would worsen upon his return to Haiti and that his infection, left unmedicated, "will cross [his] blood-brain barrier and will cause him to exhibit various neuropsychological illnesses such as neurosyphilis, herpes encephalitis, or general paresis of the insane." R. at 194.

Dr. Francis Cournos, professor of clinical psychiatry at Columbia University and deputy director of the New York State Psychiatric Institute, is an expert on the mental consequences associated with HIV/AIDS. Her affidavit averred that

6

individuals like Jean Pierre with late-stage AIDS are often "unable to function mentally, delirious, hallucinatory, or even psychotic," and that they are also prone to infection. R. at 192. In particular, she testified that cytomegalovirus -- an infection that has already caused Jean Pierre to go blind in one eye -- "infects the brain of an AIDS patient, causing rapid personality changes." R. at 193.

Finally, Michelle Karshan, the director of Alternative Chance, a Haiti-based program providing assistance to criminal deportees from the U.S., testified regarding the link between conditions in Haitian prisons, stigmatization of AIDS patients, and the treatment of mentally ill prisoners. Notably, Karshan said that prisoners with mental health issues are more likely to act out, and that the officers in a prison she visited used extended confinement in a tiny crawl space to deal with these difficult patients:

> [I]f they have mental health problems, and they act out, which a lot of them do . . . . people think that they[] . . . have a spell, that they're possessed, . . . and when the officers cannot handle them, . . . they use a crawl space under the stairs. It's a tiny space where you can't even stand up, and they just lock them in there and sometimes for months on end, and there's no process to see them, either. They have to rely on some compassionate fellow prisoner to bring them food. So, you know, people can just die in the crawl space. I'm talking about just, you know, that little space under the stairwell, and they're just locked in there. It's a closet, and they can't stand, and they don't have a bed or anything, and that's where they stay for months, and I've personally witnessed that. You know, we fought very hard against that crawl space process, and they're still using it right this second.

R. at 290.

7

Karshan further testified that food inside the prisons is distributed by other inmates, and that sick or mentally ill prisoners were often unable to get any food. R. at 189. Finally, she said that criminal deportees from the United States are treated especially harshly, and that they are sometimes "beaten with metal wands because the prison guards perceive them to be professional criminals deserving of the punishment." R. at 190. The government offered no facts in response to this record.

B.

The Immigration Judge ("IJ") denied Jean Pierre's application for withholding of removal under the Convention Against Torture on January 3, 2006. Notably, he found that Jean Pierre's testimony was "clear, believable, and sufficiently detailed" and called him a credible witness. R. at 196–197. The IJ ultimately decided, however, that Jean Pierre had "not met his burden of proof and established that it is more likely than not that he will be tortured by the Haitian government if he is returned to Haiti." R. at 197. Following the reasoning of an earlier Board of Immigration Appeals case, In re J-E-, 23 I. & N. Dec. 291, 301 (BIA 2002) (en banc), he said that there was "no evidence in the Record of Proceedings that the Haitian government deliberately creates and maintains those conditions as a means of torturing inmates." R. at 197; see also R. at 198 ("To state that the Haitian government, the poorest in the Western Hemisphere, intends to

8

torture its prisoners when it merely is incapable of remedying its prison system unfairly twists the meaning of protection under the Convention Against Torture."). As for the fact that Jean Pierre has AIDS, the IJ concluded that there is "no evidence that the government specifically targets [people with HIV/AIDS] for mistreatment or lack of medical treatment." R. at 198. Finally, he observed, "the treatment the Respondent will encounter in the Haitian jail, while horrendous, does not rise to the level of torture as contemplated by the Convention Against Torture." R. at 198.

Jean Pierre appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which affirmed the Immigration Judge in a short opinion. The BIA "acknowledge[d], as did the Immigration Judge, that the respondent's advanced and untreated HIV illness would likely lead to delirium and other psychotic symptoms," and it could not "dispute the logical conclusion that prisoners who suffer from such symptoms are likely to be less cooperative with the prison guards' administration of their duties." R. at 26 (emphases added). However, the BIA concluded,

> despite some evidence in the record indicating that those, like the respondent, who are mentally ill or afflicted with HIV may endure harsher circumstances as a result of their medical condition than the average criminal deportee, the evidence does not support a finding that it is more likely than not that the respondent will be tortured upon his return to Haiti. See 8 C.F.R. § 1208.18(a)(1) (defining torture as "any act by which severe pain or suffering, whether physical or

9

mental, is <u>intentionally</u> inflicted . . . .") (emphasis added); 8 C.F.R. § 1208.18(a)(5) (the torturous act "must be <u>specifically intended</u> to inflict severe physical or mental pain or suffering") (emphasis added) ("An act that results in unanticipated or unintended severity of pain and suffering is not torture"); 8 C.F.R. § 1208.18(a)(3) (stating "[t]orture does not include pain or suffering arising only from, inherent [in] or incidental to lawful sanction[s]"); 8 C.F.R. § 1208.18(a)(2) (stating torture "does not include lesser forms of cruel, inhuman[] or degrading [treatment or] punishment").

R. at 26–27 (first two alterations in original; subsequent alterations added to indicate the correct text of the regulations). Jean Pierre timely appealed the BIA's decision. On appeal, we review only the BIA opinion. See <u>Al Najjar v. Ashcroft</u>, 257 F.3d 1262, 1284 (11th Cir. 2001) ("We review only the Board's decision, except to the extent that it expressly adopts the IJ's opinion.").

## II.

First, the government argues that we are without jurisdiction to consider Jean Pierre's claim because of the jurisdictional limits found in the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 302 (codified in scattered sections of 8 U.S.C.). The REAL ID Act limits federal court jurisdiction in cases involving certain criminal aliens to "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." 8 U.S.C. § 1252(a)(2)(D); <u>see also</u> <u>id.</u> § 1252(a)(2)(C) ("[E]xcept as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed

10

a criminal offense covered in [the enumerated sections].").

Under the REAL ID Act, we have jurisdiction over "questions of law." <u>See</u> <u>id.</u> § 1252(a)(2)(D). Because the statute presents the jurisdictional provision in § 1252(a)(2)(D) as an exception to the general rule barring appellate review of final removal orders in cases involving criminal aliens in § 1252(a)(2)(C), moreover, we have jurisdiction <u>only</u> to the extent that Jean Pierre raises such "constitutional claims or questions of law." In other words, the REAL ID Act prevents us from reviewing factual determinations made by the IJ or BIA in cases involving aliens who have committed a listed criminal offense. <u>Cf.</u> <u>Chacon-Botero</u> <u>v. U.S. Att'y Gen.</u>, 427 F.3d 954, 957 (11th Cir. 2005) (per curiam) (holding, in a case involving a related provision of the REAL ID Act, that "discretionary or factual determinations continue to fall outside the jurisdiction of the court of appeals entertaining a petition for review").

According to the government, Jean Pierre's claim does not raise a "question of law" because he is really attempting to challenge a factual determination concerning the likelihood that he will be subjected to torture. In other words, the government asserts, Jean Pierre is really trying to circumvent the unambiguous limitations Congress has placed on our jurisdiction by dressing up a purely factual challenge as a question of law. We are unpersuaded.

We begin with <u>Cadet</u>, an immigration case involving a criminal alien

11

decided shortly before Congress passed the REAL ID Act. There, a panel of this Court held that habeas corpus jurisdiction extends to the adjudication of mixed questions of law and fact,[4] including the question of whether a particular course of conduct (fact) constitutes torture (law). See 377 F.3d at 1184 ("[T]he scope of habeas review available in § 2241 petitions by aliens challenging removal orders . . . includes constitutional issues and errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts . . . ."); see also INS v. St. Cyr, 533 U.S. 289, 302 (2001) ("[T]he issuance of the writ [of habeas corpus] was not limited to challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes."). Having found jurisdiction, we reviewed the BIA's legal conclusions de novo, according Chevron deference to the BIA's interpretation of the immigration laws. See Cadet, 377 F.3d at 1185–86

---

[4] The Supreme Court has defined such questions as those "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." Pullman-Standard v. Swint, 456 U.S. 273, 290 n.19 (1982). Mixed questions are generally held to fall within the jurisdiction of the reviewing court even when the court's jurisdiction to review the facts themselves has been limited or eliminated. See, e.g., Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963) ("By 'issues of fact' we mean to refer to what are termed basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators . . . .' Brown v. Allen, 344 U.S. 443, 506 (opinion of Mr. Justice Frankfurter). So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense.").

("Thus, where a statute or regulation is silent or ambiguous, we are obliged to defer to the BIA's interpretation and application of statutes and regulations if that interpretation is reasonable.").

The REAL ID Act changed the basic mechanism of federal judicial review; criminal aliens seeking review of an unsuccessful CAT claim may no longer proceed in habeas. Rather, the exclusive mechanism for judicial review is a petition for review filed with the appropriate court of appeals. 8 U.S.C. § 1252(a)(5); see also Balogun v. United States AG, 425 F.3d 1356, 1359–60 (11th Cir. 2005) (explaining how the REAL ID Act altered "double-layered review for criminal aliens"). While the mechanism changed, however, the scope of our review of the law did not. As we observed recently in Alexandre v. United States Attorney General, 452 F.3d 1204 (11th Cir. 2006) (per curiam), the REAL ID Act "offers the same scope of review as a habeas remedy" in a case involving a criminal alien's appeal of a removal order. Id. at 1206. Alexandre was not a CAT case, but it did construe the same generally applicable jurisdictional limitations imposed by the REAL ID Act. See id. We can see no reason why the result should be different in the context of reviewing a CAT claim. Indeed, Alexandre specifically cited to Cadet, the CAT case in which we determined that review of the application of law to undisputed facts falls well within the scope of the court's jurisdiction. See id. (citing Cadet, 377 F.3d at 1184).

13

The necessary conclusion we draw from our precedent and from the language found in the REAL ID Act is that we have jurisdiction to review Jean Pierre's claim in so far as he challenges the application of an undisputed fact pattern to a legal standard. This conclusion is fully consonant with the decisions reached by the other courts of appeal that have considered the issue. See Ramadan v. Gonzales, 479 F.3d 646, 654 (9th Cir. 2007) (per curiam) ("We therefore conclude that the phrase 'questions of law' as it is used in . . . the Real ID Act includes review of the application of statutes and regulations to undisputed historical facts. This construction is amply supported by the statute and legislative history, and a narrower interpretation would pose a serious Suspension Clause issue." (footnote omitted)); id. at 650 ("'[Q]uestions of law,' as it is used in [the REAL ID Act], extends to questions involving the application of statutes or regulations to undisputed facts, sometimes referred to as mixed questions of fact and law."); Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 326–27 (2d Cir. 2006) ("We construe the intent of Congress's restoration under the REAL ID Act rubric of 'constitutional claims or questions of law' to encompass the same types of issues that courts traditionally exercised in habeas review over Executive detentions."); Kamara v. Att'y Gen. of the U.S., 420 F.3d 202, 211 (3d Cir. 2005) (holding that the scope of review under the REAL ID Act "mirrors our previously enunciated standard of review over an alien's habeas petition").

This analysis is also fully consistent with the legislative history of the REAL ID Act. The Conference Report for the Act specifically says that when "presented with a mixed question of law and fact, the court should analyze it to the extent there are legal elements, but should not review any factual elements." Conference Report for the REAL ID Act, H.R. Rep. No. 109-72, at 175 (2005), as reprinted in 2005 U.S.C.C.A.N. 240, 300; see also id. ("[W]hile the reforms in [8 U.S.C. § 1252] would preclude criminals from obtaining review over non-constitutional, non-legal claims, it would not change the scope of review that criminal aliens currently receive . . . .").

Whether a particular fact pattern amounts to "torture" requires a court to apply a legal definition to a set of undisputed or adjudicated historical facts. Our resolution of this issue in Cadet could not have been clearer: "whether the conditions in Haitian prisons constitute torture is a mixed question of law and fact as we must apply CAT's legal definition of 'torture' to the facts of what happens in Haiti's prisons." 377 F.3d at 1192. Jean Pierre's claim squarely and unambiguously raises this question. In light of our binding precedent in Cadet and Alexandre, the persuasive authority of the other courts of appeal, and the plain language and legislative history of the REAL ID Act, we have little difficulty in concluding that this Court has jurisdiction to entertain whether a fact pattern constitutes torture.

15

**III.**

Plainly, Jean Pierre is subject to removal from the United States as a criminal alien under 8 U.S.C. § 1227. Claiming that he would be tortured if returned to his native Haiti, Jean Pierre applied for relief under the United Nations Convention Against Torture.[5] As a signatory to the Convention, the United States has agreed not to "expel, return . . . or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, § 1, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85. An alien is entitled to CAT protection if he is "more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(4). The petitioner bears the burden of proof on this point. See Cadet v. Bulger, 377 F.3d 1173, 1180 (11th Cir. 2004).

The legislation and regulations implementing the CAT provide that torture is an "extreme form of cruel and inhuman treatment and does not include lesser

---

[5] Properly speaking, the Convention itself provides no legal protection. Because the Convention is not self-executing, a petitioner raising a CAT claim is actually seeking relief under the Convention's implementing legislation, the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822 (codified at 8 U.S.C. § 1231 note). This Act states that "[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." Id.; see also Cadet, 377 F.3d at 1179–80 & n.3 (discussing the ratification and implementation of the CAT). For convenience, we refer to Jean Pierre's claim as a "CAT claim."

forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2); see also Cadet, 377 F.3d at 1181. Moreover, the actor must have specifically intended to inflict such severe pain or suffering, 8 C.F.R. § 208.18(a)(5), and the act must be inflicted for a proscribed purpose, including "for any reason based on discrimination of any kind," id. § 208.18(a)(1). Public officials or other persons acting in an official capacity must be involved, and the treatment must be directed at a person within their custody or physical control. See id. (referring to "pain or suffering . . . inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity"); id. § 208.18(a)(7) ("Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity."); id. § 208.18(a)(6) ("In order to constitute torture an act must be directed against a person in the offender's custody or physical control.").

Jean Pierre's argument for CAT relief was based on the claim that he will likely be tortured in a Haitian prison when his AIDS infection, unchecked by lifesaving medication, infects his mind and causes him to behave inappropriately or erratically. He claims that the Haitian prison guards, acting out of fear or prejudice, will likely beat him with metal rods, strike him about the head and ears (kalot

17

marassa), and, perhaps most disturbingly, lock him in a tiny crawl space for weeks or months without food or even room to stand upright. The BIA, like the IJ, did not directly address this central claim.

The BIA seems to have thought that two earlier cases, In re J-E-, 23 I. & N. Dec. 291 (BIA 2002) (en banc), and Cadet v. Bulger, 377 F.3d 1173, disposed of Jean Pierre's claim. The BIA cited to both cases in observing that:

> The mere fact that the Haitian government does not exempt those criminal deportees who suffer from severe medical conditions from their detention policy, a policy we have found to be a legitimate and lawful sanction, does not constitute torture. See Matter of J-E, supra. In addition, as noted by the Immigration Judge, nothing in the record supports the notion that the Haitian government deliberately creates or maintains the unhygienic conditions for purposes of torturing its detainees. (I.J. at 21). See 8 C.F.R. §§ 1208.18(a)(1) and (5). Further, the United States Court of Appeals for the Eleventh Circuit, the jurisdiction in which this case arises, has deferred to our reasonable interpretation that police brutality in Haiti, including "beatings, with fists, sticks, and belts," does not rise to the level of torture pursuant to CAT. Cadet v. Bulger, 377 F.3d 1173, 1195 (11th Cir. 2004). Even if intentional, none of the harm the respondent might face rises above that which is characterized in the regulations as "lesser forms of cruel, inhuman or degrading punishment," and, therefore, it cannot be deemed torture.

R. at 27 (footnote omitted). Cadet and In re J-E- held, among other things, that Haiti is a poor country, and that its inability to maintain better prisons did not mean that it tortures those it holds, even when it indefinitely confines criminals deported from the United States and may subject them to mistreatment short of torture. See In re J-E, 23 I. & N. Dec. at 301–04 (holding that poor prison conditions, indefinite

18

detention of criminal deportees, and police mistreatment such as "[b]eating with the fists, sticks, and belts," were not torture); Cadet, 377 F.3d at 1193 (deferring to this interpretation).

Those cases are different. In both cases, the petitioners failed because, among others, they could not establish that they would be individually and intentionally singled out for harsh treatment. Although both petitioners produced evidence of generalized mistreatment and some isolated instances of torture,[6] the evidence was insufficient to meet the petitioners' burdens of showing that they were individually "more likely than not to be tortured in the country of removal." 8 C.F.R. § 208.16(c)(4); see In re J-E-, 23 I. & N. at 304 ("[W]e find that the respondent has failed to establish that these severe instances of mistreatment are so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture, as opposed to other acts of cruel, inhuman, or degrading punishment or treatment."); Cadet, 377 F.3d at 1195 (focusing on the petitioner's

---

[6] Both Cadet and In re J-E- acknowledge that some of the abuses discussed in the State Department Country Reports on Haiti would, in fact, constitute torture. See Cadet, 377 F.3d at 1195 ("[W]e read the BIA's decision in J-E as acknowledging that certain isolated, vicious and deliberate acts, such as burning with cigarettes, choking, hooding, kalot marassa, and electric shock do occur in Haitian prisons and that such acts constitute CAT-prohibited 'torture.'"). While we deferred to the BIA's determination that "[b]eating[s] with the fists, sticks, and belts," were not torture but rather "lesser forms of cruel, inhuman or degrading treatment or punishment," we were unpersuaded by the argument that such misconduct was somehow not intentional. See Cadet, 377 F.3d at 1195 n.20 ("We note that these types of physical abuse in Haitian prisons are intentional acts, as opposed to inescapable results of Haiti's economic hardship. Accordingly, unlike the prison conditions addressed above, these types of physical abuse cannot be described as 'incident to' a lawful sanction.").

19

failure to make an individualized showing); see also Lavira v. Att'y Gen. of the U.S., 478 F.3d 158, 164 (3d Cir. 2007) ("It cannot be questioned that the undisputed facts Lavira presented in support of his claim are not merely an attack on the 'general state of affairs.' Lavira's CAT claim details how guards will treat this HIV-positive prisoner . . . . The facts supporting Lavira's claim are 'evidence tending to show that he faces an increased likelihood of torture' compared to the alien in Matter of J-E- . . . .").

Jean Pierre's claim, at both stages of the administrative process and on appeal, was not limited to the assertion that placing a man with AIDS in a Haitian prison amounts to a death sentence. Instead, as a thorough review of the 1,500-page record reveals, Jean Pierre's central claim has always been that placing this man in a Haitian prison, with guards who beat mentally ill patients with metal rods and lock them in small crawl spaces, would violate the commitment of the United States not to remove a person who is "more likely than not to be tortured in the country of removal," 8 C.F.R. § 208.16(c)(4). See, e.g., R. at 1364 ("People with mental health problems are singled out for torture in the prisons. . . . Jean Pierre will act in deviant ways because of the mental health complications of his AIDS and this will cause him to be singled out in the jails of Haiti and tortured."); R. at 1372 ("The increased attention of Haitian prison guards [caused by deviant behavior] is especially dangerous because country conditions reports confirm that

torture occurs in Haitian prisons."); R. at 1373 ("[T]he general practice in the National Penitentiary where Mr. Jean Pierre will be sent is to lock individuals with mental illness into a crawl space under the stairs. People locked in the crawl space are not given food to eat and are unable to stand for lack of room." (citations omitted)); R. at 1376 ("Violence has been directed particularly toward the mentally ill in Haitian prisons. . . . People with mental illness are given the worst conditions in prison." (citations omitted)); R. at 1380 ("With the high likelihood of psychiatric complications and consequent deviant behaviors, Mr. Jean Pierre is highly likely to become a target of violence from prison guards . . . and be confined to the crawl space under the stairs."); R. at 1368 (kalot marassa); R. at 1369 (kalot marassa); R. at 1375 (crawl space confinement); R. at 1378 (physical violence and crawl-space confinement).

The government did not in any way dispute the facts underlying Jean Pierre's claim, and the IJ found him to be a credible witness. In his disposition of the claim, however, the IJ did not discuss the harsher forms of mistreatment detailed by Jean Pierre. More importantly, the BIA decision, the subject of our review, makes no mention of kalot marassa, confinement in a crawl space, or beatings with metal rods. These details are omitted despite the fact that the BIA has itself recognized kalot marassa as an example of "mistreatment in Haitian prisons that rise[s] to the level of torture." In re J-E-, 23 I. & N. Dec. at 302; see also

21

Cadet, 377 F.3d at 1194–1195.

At best, the BIA opinion can be read as obliquely referencing Jean Pierre's argument that he would face harsher treatment as a result of mental illness. See R. at 26 (referencing "some evidence in the record indicating that those, like the respondent, who are mentally ill or afflicted with HIV may endure harsher circumstances as a result of their medical condition"). In our view, the BIA omitted from its analysis any review of the most important facts presented in this case. There is, of course, an important difference between considering the evidence and reciting it; the BIA need not mechanically list every piece of evidence in the record on its way to rendering a decision. See Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1376–77 (11th Cir. 2006) (observing that, although the IJ must consider all the evidence before him, he is not required to discuss every piece of evidence presented). But in this case, the BIA erred in apparently omitting from its review the central and undisputed facts that drive this petition.

Moreover, the BIA erred in failing to address the petitioner's essential legal arguments -- arguments so central to Jean Pierre's claim that we are unable to review the issue presented by this appeal. Jean Pierre was not rearguing In re J-E- and Cadet. Instead, he presented a new and different legal question: whether a petitioner is entitled to withholding of removal under the Convention Against Torture when the undisputed evidence seems to show that he likely will be singled

22

out for crawl-space confinement, kalot marassa, and beatings with metal rods as a result of AIDS-related mental illness. As best as we can tell, the BIA did not answer this question.

Accordingly, we are constrained to agree with Jean Pierre that the BIA failed to give reasoned consideration to his claims. See 8 C.F.R. § 208.16(c)(3) ("In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered . . . ." (emphasis added)); see, e.g., Lavira v. Att'y Gen. of the U.S., 478 F.3d 158, 164 (3d Cir. 2007) (holding, in a case involving an HIV-positive criminal alien who claimed that he would be singled out for torture if returned to Haiti, that a "decision that flatly ignores the grounds presented by the petitioner fails to furnish the Court of Appeals with the basis for its particular decision, and as such any meaningful review is not possible"); see also, e.g., Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375–77 (11th Cir. 2006) (granting a petition for review of an application for withholding of removal when the absence of a reasoned decision and adequate factual findings left the court unable to review the claim); Mezvrishvili v. U.S. Att'y Gen., 467 F.3d 1292, 1297 (11th Cir. 2006) (per curiam) (same result in an asylum case); Enwonwu v. Gonzales, 438 F.3d 22, 35 (1st Cir. 2006) (remanding a CAT determination to the BIA because it was "insufficiently reasoned as a matter of law"); Antipova v. U.S. Att'y Gen., 392

23

F.3d 1259, 1265 (11th Cir. 2004) (remanding a petition for asylum to the BIA because the court could not "undertak[e] meaningful judicial review of the merits").

The BIA is obliged to resolve the basic questions raised in this CAT petition in the first instance. See Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (per curiam) ("A court of appeals 'is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.'" (quoting INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam)); see also Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1236 (11th Cir. 2007) ("The Supreme Court has instructed that, when the IJ or BIA has not made findings of fact or has not applied the law to those facts, appellate courts should remand to allow the IJ to make such determinations in the first instance."); Lopez v. U.S. Att'y Gen., 490 F.3d 1312, 1316 (11th Cir. 2007) (discussing the "ordinary remand rule").

Indeed, in a motion filed with us following oral argument in this case, the government "agree[d] that a remand to the Board would be appropriate with instructions that the agency consider and address the factual allegations concerning whether Jean Pierre, upon his return to Haiti, would be subject to physical abuse amounting to torture (to include kalot marassa, confinement in crawl spaces and beatings with metal rods), as that term has been defined by regulations, Board

24

decisions, and this Court, as to warrant deferral of removal under the Convention Against Torture . . . . Given the importance of this issue, the Board should have an opportunity to address this claim in the first instance." Respondent's Motion to Remand at 1–2.

On remand, the BIA must squarely address Jean Pierre's claim that he likely will be singled out for crawl-space confinement, beatings with metal rods, and kalot marassa in light of the five-part analysis employed by this Court in Cadet. See 377 F.3d at 1192 ("[F]or an act to constitute 'torture' under CAT and its implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions."); id. at 1195 (focusing on whether the petitioner presented evidence "qualitatively different than or superior to the J-E- record").

The essential problem we face is that we are unable to meaningfully review the application of the law of torture to the basic facts of the case without first having the benefit of the BIA's review and resolution of Jean Pierre's central claim. Accordingly, we are required to GRANT Jean Pierre's petition for review, VACATE the BIA's decision, and REMAND for further proceedings consistent with this opinion.

25

VACATED AND REMANDED.