[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13187

_____

WALTER JAVIER ALVARENGA ROMERO,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A212-944-965

_____

Before JILL PRYOR, LUCK, and BRASHER, Circuit Judges.

PER CURIAM:

Walter Alvarenga Romero petitions for review of the Board of Immigration Appeals's dismissal of his appeal of the immigration judge's order denying his application for asylum, withholding of removal, and relief under the Convention Against Torture. He argues that the board erred by affirming the denial of his asylum and withholding of removal claims because the evidence compels a finding that, if he were removed to his home country of El Salvador, he would be persecuted on account of his membership in his particular social group—individuals who suffer from a mental illness and behave erratically. After a thorough review of the record and with the benefit of oral argument, we grant Alvarenga's petition as to his claims for asylum and withholding of removal and remand for further proceedings, but we deny it as to his claim under the Convention Against Torture.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Alvarenga, a citizen of El Salvador, came to the United States in 2007 when he was sixteen years old. In 2012, he began exhibiting the symptoms of a mental illness. Alvarenga heard voices and experienced paranoia. His family called the police, who hospitalized Alvarenga. He was later diagnosed with schizophrenia.

Following his diagnosis, Alvarenga's symptoms re-emerged whenever he refused to take his medication, and his family would

have him hospitalized—often for weeks at a time. Alvarenga was hospitalized four times between 2012 and 2017 because of his schizophrenia.

*The Immigration Court Proceedings*

In 2017, the Department of Homeland Security served Alvarenga with a notice to appear before the Immigration Court. Alvarenga conceded removability and the immigration judge sustained the charge. Alvarenga then requested asylum, withholding of removal, and relief under the Convention Against Torture. The immigration judge denied Alvarenga relief and ordered him removed to El Salvador.

Alvarenga appealed to the board, and the board remanded the case to the immigration judge to determine whether Alvarenga was competent, and, if necessary, to conduct a new hearing with appropriate procedural safeguards. On remand, the immigration judge determined that Alvarenga wasn't competent to litigate his own case and appointed counsel.

Alvarenga, now represented, then filed a second application for asylum, withholding of removal, and relief under the Convention Against Torture. Alvarenga argued that he had a well-founded fear of future persecution if he were removed to El Salvador on account of his particular social group: individuals from El Salvador who suffer from a mental illness and behave erratically.[1] He

---

[1] Alvarenga also proposed several alternate social groups as a basis for relief: "Individuals in El Salvador who suffer from schizophrenia; Schizophrenic

contended that El Salvador had a "horrific record" in dealing with people suffering from severe mental illness and stigmatized mental illness.  This stigma rose to the level of persecution, Alvarenga maintained, because he would be harmed by government officials (the police, the military, and the staff in El Salvador's mental health institutions), and by gangs that the government was "unable and unwilling to control."  Alvarenga also argued that he was likely to be "singled out" for persecution because he wouldn't receive adequate treatment for his schizophrenia, he would end up homeless because he had no family in El Salvador, and he would exhibit erratic behavior attributable to his mental illness, which in turn would cause gang members to notice and persecute him.

Alvarenga submitted reports from the United Nations and other organizations describing the poor state of El Salvador's mental health facilities, the overuse of institutionalization, and the societal stigma against individuals with mental illnesses.  Alvarenga also submitted an affidavit from Dr. Samuel Nickels, an expert on social conditions in El Salvador, describing the state of El Salvador's mental health facilities, the poor treatment of individuals who

individuals in El Salvador; Individuals in El Salvador diagnosed with paranoid schizophrenia; Individuals from El Salvador who suffer from paranoid schizophrenia and display erratic behavior; Individuals from El Salvador who suffer from severe mental disabilities; Individuals from El Salvador who suffer [from] paranoid schizophrenia without family support, such as schizophrenia [sic]; [and] Schizophrenic individuals in El Salvador without family support."

suffer from mental illnesses, and the heightened risks they face from gang members and the police.

The immigration judge held a hearing on Alvarenga's application. Alvarenga testified about his mental illness, his history of hospitalizations, his lack of family support in El Salvador, and his fear of returning.

Dr. Nickels also testified in support of Alvarenga's application. He explained that if Alvarenga were to be hospitalized in El Salvador's primary mental health institution, he would likely be subjected to involuntary electroconvulsive therapy.[2] Dr. Nickels explained that there were widespread instances of overcrowding and medical neglect in the mental health institution: a common sight included patients "behind bars," wearing "no clothing," or just lying "on the cement floor in catatonic positions."

Dr. Nickels explained that he believed Alvarenga would end up homeless in El Salvador, which would make him particularly susceptible to abuse by gang members and the police who would interpret his erratic behavior as resistance or disrespect. Dr. Nickels testified that gang members were "known to get irritated with these folks and just deal with them by stabbing or beating them up," and that "there is real physical abuse and, sometimes, death and killings that result from the [mental] illnesses that these folks

---

[2] Electroconvulsive therapy is a psychiatric treatment where a patient is anesthetized, fitted with an electric helmet, and then jolted with a pulse of electricity running through the frontal lobe of the patient's brain.

have." Dr. Nickels explained that although there are laws in El Salvador prohibiting discrimination against the mentally ill, gang members operate with impunity and the risk of violence was further exacerbated by the ongoing gang wars.

When he was asked how people in El Salvador would know that Alvarenga suffered from a mental illness, Dr. Nickels explained that:

> [T]hey may or may not know that the person has a mental illness depending on whether they have any education and understanding about what a mental illness is. What they will certainly be able to observe and understand [is] that this person has bizarre behaviors . . . that would sort of stigmatize this person as being loco, crazy or violent and so in that sense, they would certainly be identifiable, what you and I would call somebody with mental illness but people across society might not use that term. They might just simply say, "Yeah, he's a crazy guy. Watch out for him . . . ."

Dr. Nickels testified that this stigma put Alvarenga at a higher risk of harm relative to someone who didn't suffer from a mental illness.

The immigration judge again denied Alvarenga's application for asylum, withholding of removal, and relief under the Convention Against Torture. The immigration judge assumed that

Alvarenga's proposed particular social groups were cognizable, but concluded that he was ineligible for asylum because Alvarenga hadn't demonstrated past persecution or a well-founded fear of future persecution on account of a statutorily protected ground.[3] The immigration judge found that Alvarenga and Dr. Nickels were credible but explained that even though Alvarenga subjectively believed he would be persecuted, he had failed to show there was a "nexus" between any future persecution and his mental illness. The immigration judge broke his "nexus" finding into three parts: nexus as to El Salvador's mental health system; nexus as to gang members; and nexus as to the police.

As to persecution in El Salvador's primary mental health institution, the immigration judge found that any harm to Alvarenga would be "due to underfunding of mental health services and a lack of trained professionals rather than a specific desire to harm those with mental illnesses." The immigration judge also found that Alvarenga couldn't show a "pattern or practice" of persecution by mental health workers on account of his particular social group because any mistreatment by them would result from "an underfunded system and lack of training."

---

[3] The immigration judge also determined that Alvarenga had not demonstrated the harm he feared in El Salvador rose to the level of persecution. But the board did not reach this issue and did not adopt the immigration judge's finding on this point. We therefore do not consider it. *See Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016) ("We do not consider issues that were not reached by the [board].").

As to persecution by gang members and the police, the immigration judge found that Alvarenga had not shown they would know he had a mental illness; rather, he "could be harmed or incarcerated due to a police officer's lack of training regarding those with mental illnesses or a gang member's lack of education regarding those with mental illnesses." The immigration judge also found there was no pattern or practice of persecution by gang members or the police on account of his particular social group because there was no evidence that people with mental illnesses were "systematically targeted by gangs or police officers on account of their mental disability, or that there is a heightened level of impunity for individuals who commit crimes against the disabled." The immigration judge instead found that "the evidence suggest[ed] that" Alvarenga "would face harm arising from conditions of civil strife and general criminal activity," which was not on account of his mental illness.

Because Alvarenga hadn't shown a well-founded fear of future persecution on account of a protected ground, the immigration judge concluded that he was also ineligible for withholding of removal and relief under the Convention Against Torture.

### The Board of Immigration Appeals's Decision

Alvarenga appealed to the board, and the board dismissed his appeal. The board said that the immigration judge didn't clearly err in finding that Alvarenga's particular social group wouldn't be "a central reason" for his persecution. The board also broke down the nexus finding into three parts—nexus as to El Salvador's

psychiatric hospitals, nexus as to gang members, and nexus as to the police.

As to El Salvador's psychiatric hospitals, the board said that the immigration judge didn't clearly err in finding that any harm Alvarenga would face in a mental health institution would be because of underfunding and a lack of training, rather than a specific desire to harm those with a mental illness. As to gangs, the board said there was no nexus because Dr. Nickels testified that people in El Salvador would likely only recognize a person as having a mental illness if they had an individualized education regarding mental illness. The board also said that although Dr. Nickels testified that Alvarenga's symptoms and erratic behavior would increase the chances of gang members targeting him, this evidence suggested that Alvarenga would face only harms arising from conditions of general criminal activity. As to the police, the board said that the immigration judge didn't clearly err in finding that any harm by the police would be on account of frustration with Alvarenga's behavior "rather than specifically on account of [his] mental illness."

Finally, the board determined that the immigration judge didn't clearly err in finding that there was no pattern or practice of persecution by mental health professionals, gangs, or the police against Alvarenga's particular social group because there were laws on the books prohibiting discrimination against the mentally ill, and the evidence did not show that those with a mental illness were "systematically targeted." The board determined that because Alvarenga had not established that any future persecution would "be

on account of a protected ground," he had failed to establish his eligibility for asylum.

The board then concluded that because Alvarenga had failed to establish his eligibility for asylum, he was also ineligible for withholding of removal. And because any mistreatment by mental health workers would be caused by insufficient resources and inadequate training, the board said that Alvarenga was ineligible for relief under the Convention Against Torture.

## II.    STANDARD OF REVIEW

We review the board's decision as the final judgment unless the board expressly adopts the immigration judge's decision. *Gonzalez v. U.S. Att'y Gen.*, 820 F.3d 399, 403 (11th Cir. 2016). Where the board agrees with the immigration judge's reasoning, we review the decisions of both the board and the immigration judge to the extent they agree. *Id.*

"[W]e review" the board's "conclusions of law de novo and factual determinations under the substantial evidence test." *Id.* Under the substantial evidence test, we view the record in the light most favorable to the board's decision and draw all reasonable inferences in the board's favor. *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). We "must affirm the [board]'s decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quotation marks omitted). The board's "findings of fact" may be "reversed by this court only when the record compels a reversal; the mere

fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." *Id.* "Whether a petitioner has established a sufficient nexus between persecution and a statutorily protected ground is a question of fact and therefore reviewed under the substantial evidence test." *Jathursan v. U.S. Att'y Gen.*, 17 F.4th 1365, 1373 (11th Cir. 2021).

## III.    DISCUSSION

Alvarenga argues that the board erred in affirming the immigration judge's denial of his claims for asylum, withholding of removal, and relief under the Convention Against Torture.  We address each of Alvarenga's claims below.

### Asylum and the Nexus Requirement

We focus on the narrow question of nexus—the sole basis for the board's affirmance of the immigration judge's denial of Alvarenga's asylum claim.  Alvarenga argues that Dr. Nickels's testimony compelled the conclusion that his mental illness would be "one central reason" he would suffer persecution at the hands of three different groups:  gang members, the police, and mental health professionals.  We agree with Alvarenga as to the first group.  The evidence in this case—unrefuted by the government in any way—was that gang members likely would intentionally target and attack Alvarenga because of his mental illness and because they would identify him as "crazy" or "loco."  This undisputed evidence compels the conclusion that "one central reason" for his

persecution by gang members if he returned to El Salvador would be his particular social group.

An asylum claim requires the applicant to prove that: (1) he was previously persecuted "on account of race, religion, nationality, membership in a particular social group, or political opinion," or (2) he has a "well-founded fear" of future persecution "on account of" a protected ground. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1); 8 C.F.R. § 208.13(a), (b). Because Alvarenga's mental illness emerged after he came to the United States, this is a "well-founded fear" case.

To be eligible for asylum, an applicant "must show a nexus between the alleged persecution and a protected status—'that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least *one central reason* for persecuting the applicant.'" *Murugan v. U.S. Att'y Gen.*, 10 F.4th 1185, 1195 (11th Cir. 2021) (quoting 8 U.S.C. § 1158(b)(1)(B)(i)); *see also Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1286 (11th Cir. 2021) (explaining that the "causal element" of an asylum claim is "known as the nexus requirement").

We have said that a "reason is central if it is 'essential' to the motivation of the persecutor." *Sanchez-Castro*, 998 F.3d at 1286 (citation omitted). "In other words, the protected ground cannot play a minor role" in the applicant's "fears of future mistreatment. That is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (quotation omitted). Thus, any "feared future persecution must be at least in significant part

'because of' the protected ground." *Id.* (quoting *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 891 (11th Cir. 2007)). An applicant can satisfy the nexus requirement "by presenting 'specific, detailed facts showing a good reason to fear that he . . . will be *singled out* for persecution on account of' such [protected] ground." *Mehmeti v. U.S. Att'y Gen.*, 572 F.3d 1196, 1200 (11th Cir. 2009) (quoting *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005)).[4]

Here, because the board "considered only the nexus requirement, we review only whether substantial evidence supports its finding that [Alvarenga] did not satisfy that requirement." *See Sanchez-Castro*, 998 F.3d at 1286. "We do not consider whether [Alvarenga] . . . has a well-founded fear of future persecution," or whether his proposed particular social group was valid. *See id.* In other words, the only thing we consider as to Alvarenga's asylum claim is the question of nexus.

The board and immigration judge found, for two reasons, that Alvarenga failed to establish a nexus between future persecution by gangs and his particular social group. First, they said that

---

[4] An applicant for asylum can also prove nexus "if he can establish a pattern or practice of persecution of a group of which he is a member." *Mehmeti*, 572 F.3d at 1200 (citing 8 C.F.R. § 208.13(b)(2)(iii)). Because we conclude that that the record "compels" a finding that Alvarenga would be singled out for persecution in El Salvador on account of his particular social group, *see Adefemi*, 386 F.3d at 1027, we do not address whether he established a pattern or practice of persecution targeting the group.

people in El Salvador would "likely only recognize a person as having a mental illness if [those people] had an individualized education regarding mental illness." And second, they said that the evidence suggested Alvarenga would experience only "harm arising from conditions of general criminal activity."

As to the first finding, Alvarenga argues that Dr. Nickels's testimony established that gang members "would recognize [him] as being 'a crazy guy'" and would persecute him for that reason. He contends that the board misconstrued Dr. Nickels's testimony that his potential persecutors "may not know that [a] person has a mental illness," because Dr. Nickels explained that his persecutors would "certainly be able to observe and understand" mental illness, regardless of whether they understood "mental illness" as a psychiatric concept. We agree. The record compels a finding that, even if gang members would persecute Alvarenga because of his behavior, any persecution would be "on account of" his particular social group—people in El Salvador who suffer from mental illness and exhibit erratic behavior.

Dr. Nickels's affidavit and testimony, credited by the immigration judge and relied on by the board, do not support the first reason given by the board and the immigration judge—that gang members would likely recognize a person as having a mental illness only if they had an individualized education regarding mental illness. As Dr. Nickels explained, even if gang members lacked "any education and understanding about what a mental illness is," they would readily recognize someone exhibiting symptoms of mental

illness as "crazy." While Alvarenga's assailants might not use clinical terms like "mental illness" to describe him, if a gang member harmed Alvarenga because he was "crazy" or "loco," that gang member would persecute him "on account of" his mental illness.

Dr. Nickels's report and testimony were the only evidence in the record as to whether gang members would know that Alvarenga was mentally ill. And the uncontested evidence, which the parties relied on and which the immigration judge found credible, was that they would. Dr. Nickels's unrefuted testimony that gang members would recognize Alvarenga as being a "crazy" person and would persecute him because he was "crazy" compels a finding that his particular social group would be "'essential' to the motivation of the persecutor." *See id.* (citation omitted).

As to the second reason given by the board and the immigration judge to find no nexus—that the evidence suggested Alvarenga would experience only "harm arising from conditions of general criminal activity"—the record again compels a contrary finding. Dr. Nickels explained that although everyone in El Salvador faces some risk from gangs, the risk would be different and greater for Alvarenga. Dr. Nickels discussed "numerous stories" from El Salvador describing stabbings, extortion, and other violent interactions between gang members and the mentally ill. Dr. Nickels explained that "gang members sometimes force persons with cognitive impairments to collect 'rent' money for the gangs or deliver threats" to businesses or individuals. He also explained that "[i]t is common for mentally ill persons" to be "physically beaten"

or even "killed" by gang members who are "either frustrated by the bizarre behaviors of persons with mental illness, or who are trying to prove their worth by attacking vulnerable persons, including those with mental illnesses." Dr. Nickels recounted how new gang members in El Salvador deliberately kill "vulnerable persons" in "gang initiation[s]" to "climb the ladder of prestige within the gang."

People with mental illnesses in El Salvador are "easy to single out," Dr. Nickels explained, because "their behavior and physical condition [are] easily identified with persons that others call 'crazy.'" For this reason, Dr. Nickels said Alvarenga was "high[ly]" likely to be "singled out" by gangs for persecution. He described how Alvarenga's "conditions and behaviors would put him at risk of inappropriately crossing gang territorial lines and being questioned, abused, or killed." That risk would be greater for Alvarenga than the average Salvadoran subject to general criminal activity, Dr. Nickels said, because he would likely become homeless due to the absence of family support, and "[h]omeless persons [in El Salvador] are particularly vulnerable to experiencing violence," including deliberate and intentional targeting at the hands of dangerous gang members.

There's no dispute that crime affecting everyone in a country is insufficient to establish nexus because it is not on account of a particular social group. *See Sanchez-Castro*, 998 F.3d at 1287–88 (explaining that the applicant failed to establish nexus because the harm she feared was "not unique to her particular social group"

and was "consistent with general criminal activity"). But the key difference here is that Dr. Nickels's affidavit and testimony are compelling evidence—and the only evidence—that Alvarenga would be targeted and victimized by gangs because of his mental illness. Although everyone in El Salvador faces some risk from gangs, the evidence presented by Alvarenga—unrebutted by the government—shows that the risk faced by him is different and greater than the risk faced by others. And the evidence shows that gang members would deliberately target Alvarenga on account of his particular social group because, as Dr. Nickels put it, he would be "easy to single out" due to his severe mental illness.

We conclude that the evidence compels the finding that Alvarenga would likely be "singled out" for persecution by gangs "on account of" his particular social group. *See Mehmeti*, 572 F.3d at 1200 (explaining that proof showing a good reason to fear being singled out for persecution because of a protected ground satisfies nexus). In other words, Alvarenga "established a sufficient nexus between [the] persecution" he feared "and a statutorily protected ground." *See Jathursan*, 17 F.4th at 1373. Because the board relied solely on the absence of nexus to affirm the rejection of Alvarenga's asylum claim, we grant this part of his petition, vacate the board's denial of his asylum claim, and remand for further proceedings.

We reiterate that our holding today is a narrow one. We do not address whether the harms Alvarenga feared amount to persecution. We do not address whether his proposed particular social group was a valid one. And we do not address whether Alvarenga

established that any persecution would be "by government forces or by non-government groups that the government cannot control." *Sama v. U.S. Att'y Gen.*, 887 F.3d 1225, 1231–32 (11th Cir. 2018) (citation and quotation marks omitted). We simply hold that the board and immigration judge erred in finding that Alvarenga failed to establish a nexus between his particular social group and his feared future persecution by gangs in El Salvador. We leave it to the board to resolve the other issues implicated by Alvarenga's asylum claim that are not resolved here.

## Withholding of Removal

Alvarenga argues that the immigration judge abused its discretion by failing to analyze his withholding of removal claim. But an applicant who fails to establish his eligibility for asylum necessarily fails to establish that he is eligible for withholding of removal. *Mehmeti*, 572 F.3d at 1200. Thus, where an immigration judge finds that an applicant is not entitled to asylum, the immigration judge is "not obligated to make specific findings with respect to withholding of removal." *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1249 n.3 (11th Cir. 2006).

Here, the board and immigration judge concluded that because Alvarenga was not eligible for asylum, he also was not entitled to withholding of removal. Given that Alvarenga's withholding of removal claim was based on the same facts as his asylum claim, the board and immigration judge were not required to make specific findings as to his withholding of removal claim. *See id.* But, because the board determined that Alvarenga was ineligible

for withholding of removal only because he was ineligible for asylum, granting Alvarenga's petition as to his asylum claim also requires that we grant his petition as to his withholding of removal claim. *See Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1239 (11th Cir. 2007) (explaining that because "the [immigration judge] denied [the] application for withholding of removal based upon his conclusion that she would not have established the less stringent standard for asylum," our decision vacating the denial of the asylum claim also required vacating the denial of the withholding of removal claim).

### Convention Against Torture

Alvarenga argues that the board erred by rejecting his claim for relief under the Convention Against Torture because any harm he would suffer would not be inflicted with the specific intent to torture him. He contends that, like the applicant in *Jean-Pierre v. U.S. Attorney General*, 500 F.3d 1315 (11th Cir. 2007), he would be subjected to torture in a mental health institution with the acquiescence of the government in El Salvador.

To qualify for relief under the Convention Against Torture, an applicant must show that it is "more likely than not that he would be tortured by or with the acquiescence of a public official in his home country." *Gonzalez*, 820 F.3d at 406; *see* 8 C.F.R. § 1208.16(c)(2). Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" in order to "obtain[] from him or her or a third person information or a confession, punish[] him or her for an act he or she or

a third person has committed or is suspected of having committed, intimidat[e] or coerc[e] him or her or a third person, or for any reason based on discrimination of any kind." 8 C.F.R. § 1208.18(a)(1). Because torture is "an extreme form of cruel and inhuman treatment," it doesn't encompass "lesser forms of cruel, inhuman or degrading treatment or punishment." *Id.* § 1208.18(a)(2). For an act to be torture, it "must be specifically intended to inflict severe physical or mental pain or suffering." *Id.* § 1208.18(a)(5).

Substantial evidence supports the board's finding that any harm that Alvarenga would suffer in a mental health institution wouldn't be inflicted on him with the specific intent to cause him severe pain or suffering. Dr. Nickels testified that the mental health institutions in El Salvador are woefully underfunded, and their staff are poorly trained and unfamiliar with psychiatric "best practices." The deplorable conditions at the hospitals and outdated treatments like electroconvulsive therapy wouldn't be inflicted on Alvarenga with the intent to harm him, but because of a lack of resources and proper training. The record doesn't compel a finding that the alleged harms Alvarenga would suffer in a mental health institution amount to torture as defined under the Convention Against Torture. *See id.* (providing that an act "must be specifically intended to inflict severe physical or mental pain or suffering" to be torture).

Alvarenga's case is not like *Jean-Pierre*. There, we vacated the board's decision because it "failed to give reasoned consideration to" the applicant's Convention Against Torture claim. *Jean-Pierre*, 500 F.3d at 1326. Here, conversely, the board gave reasoned

consideration to Alvarenga's claim under the Convention Against Torture and, as we explained, substantial evidence supported the board's finding that any harm he would suffer in a Salvadoran psychiatric hospital wouldn't be inflicted on him with the specific intent to cause him severe pain or suffering.

Moreover, as the board observed, there are laws in El Salvador prohibiting discrimination against the mentally ill. While those laws may not effectively prevent all of Alvarenga's mistreatment, we cannot say that this amounts to acquiescence by the government in El Salvador to torture. *See Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242–43 (11th Cir. 2004) (holding that a government that unsuccessfully attempts to apprehend those responsible for torture does not "acquiesce" to torture). We therefore deny Alvarenga's petition as to this claim.

## IV.    CONCLUSION

Alvarenga's petition for review is granted in part and denied in part. We deny the petition as to Alvarenga's claims for relief under the Convention Against Torture. We grant the petition as to Alvarenga's claims for asylum and withholding of removal, vacate the decision of the board on these claims, and remand for further proceedings consistent with this opinion.

**PETITION GRANTED IN PART, DENIED IN PART, AND REMANDED.**