[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15557
_____

Agency No. A058-741-346

CHADRICK CALVIN COLE,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.
_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(March 14, 2013)

Before O'CONNOR,[*] Associate Justice Retired, and MARCUS and PRYOR,
Circuit Judges.

MARCUS, Circuit Judge:

At issue in this appeal is whether the Board of Immigration Appeals ("BIA")

correctly found petitioner Chadrick Cole removable as an aggravated felon, and

_____

[*] Honorable Sandra Day O'Connor, Associate Justice (Retired) of the United States Supreme
Court, sitting by designation.

whether its denial of his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT") was proper. The BIA found Cole removable and denied his claims for asylum and withholding of removal because his underlying offense -- pointing a firearm at another person, in violation of S.C. Code § 16-23-410 -- was a particularly serious crime of violence that disqualified him from those forms of relief. The BIA further denied his claim for CAT relief based for the most part on factual determinations that he would not be tortured upon return to his native Jamaica. After thorough review, we deny Cole's petition.

## I.

## A.

The relevant facts are these. Petitioner Chadrick Cole is a native and citizen of Jamaica who was born on November 7, 1988. Cole was admitted into the United States as a lawful permanent resident in 2006.

On April 6, 2009, Cole violated a South Carolina criminal statute, S.C. § 16-23-410, which criminalizes pointing a firearm at another person. Cole pleaded guilty to the offense in a South Carolina Court of General Sessions and was sentenced, under the South Carolina Youthful Offender Act ("SCYOA"), to an indeterminate term of imprisonment not to exceed five years. On November 12, 2010, the Department of Homeland Security ("DHS") sought to remove Cole

2

pursuant to two sections of the Immigration and Nationality Act ("INA"): Title 8 U.S.C. § 1227(a)(2)(A)(iii), for having been convicted of an aggravated felony as defined in 8 U.S.C. § 1101(a)(43)(E); and 8 U.S.C. § 1227(a)(2)(C), for having been convicted of a firearms offense.

The DHS later amended the charge of removability pursuant to § 1227(a)(2)(A)(iii) and alleged, in addition to the original charges, that Cole also was convicted of an aggravated felony as defined by § 1101(a)(43)(F), which covers crimes of violence for which the term of imprisonment is at least one year. Soon thereafter, Cole submitted an application for asylum, withholding of removal, and relief under the CAT. Cole also moved for a continuance so that he could obtain additional documentary evidence from Jamaica, but the IJ denied this motion and scheduled a hearing for Cole's application.

At the hearing, Cole offered three distinct theories in support of his claims for asylum, withholding of removal, and CAT relief. First, Cole's developmental disabilities would make him a target for discrimination or persecution against disabled individuals. Second, Cole's status as a deportee would result in government abuse, including police profiling. Finally, his family's involvement with the People's National Party ("PNP") would make Cole a target of politically motivated violence from the Jamaica Labour Party ("JLP"), the PNP's primary political rivals.

3

Cole testified, and his mother Monica Singleton and his sister Annakay Charles corroborated, that he was born with his throat attached to his lungs, suffers from narcolepsy or a similar sleeping disorder, and has a severe learning disability. Due to his disabilities, he was teased and beaten up by other children in his age cohort while living in Jamaica. In addition, Cole presented evidence that, if returned to Jamaica, he would have difficulty obtaining employment or access to adequate health care. Cole also testified that he feared returning to Jamaica as a deportee, because he had heard from people in Jamaica that most deportees die upon returning there. He heard that deportees are temporarily detained in a jail called "Central" upon their return to Jamaica, although he had never seen "Central" himself. Finally, Cole testified that his father and his brother Kevin were supporters of the PNP, which is engaged in a struggle for political power with the JLP. In 2000, political rivals shot Kevin, who is now confined to a wheelchair and currently in hiding. Cole testified to his fear that, if returned to Jamaica, he would be the target of politically motivated violence. During cross-examination, Cole admitted, however, that he could relocate to a safer town where people were not aware of his political associations.

## B.

On June 20, 2011, the IJ issued a written decision denying Cole's application for asylum, withholding of removal, and CAT protection, and ordered

him removed to Jamaica. The IJ first held that Cole's SCYOA conviction constituted a "conviction" as defined in the INA. The IJ next held that Cole was removable under the government's two 8 U.S.C. § 1227(a)(2)(A)(iii) charges and the § 1227(a)(2)(C) charge. In relevant part, the IJ held that Cole's conviction was a "crime of violence" because it was an offense that has as an element the "threatened use of physical force against the person . . . of another." Cole's term of imprisonment for this offense exceeded one year, and therefore Cole was removable under § 1227(a)(2)(A)(iii).

Because Cole was convicted of an aggravated felony, the IJ determined he was ineligible for asylum under 8 U.S.C. § 1158(b)(2)(A)(ii), which bars aggravated felons from obtaining asylum. The IJ also found Cole was ineligible for withholding of removal due to 8 U.S.C. § 1231(b)(3)(B)(ii), which renders an alien ineligible for withholding of removal if the alien has been convicted of a "particularly serious crime," a term of art that covers aggravated felonies that carry a term of imprisonment of five years or more. In the alternative, the IJ also denied the withholding of removal claim on the grounds that, although Cole was credible, he could not meet his evidentiary burden because he had not proven he was more likely than not to suffer persecution upon returning to Jamaica.

Finally, the IJ considered Cole's CAT claims. The IJ made several factual findings regarding each of Cole's distinct theories of torture and ultimately rejected

5

all three. Regarding Cole's physical and mental disabilities, the IJ found that "the Jamaican government is taking commendable steps to actively combat the marginalization of persons with disabilities in the country." Thus, there was no possibility that Cole would be tortured due to his disabilities with the acquiescence of the government.

As for Cole's status as a deportee, the IJ did not find substantial evidence in the record to indicate that the Jamaican government tortured aliens removed to Jamaica. The documentary evidence indicated that "the Jamaican government has taken steps to identify dangerous deportees to address a spike in crime that has been attributed to an increase of Jamaican deportees, not for the illicit purpose of torturing deportees." The IJ also held that, even assuming arguendo that Cole's allegations of temporary detention were true, they fell short of the legal threshold for torture established by this Circuit.

Regarding Cole's claim of imputed political association, the IJ found that Cole had not established it was more likely than not that he would suffer reprisals due to his imputed political association. Cole lived in Jamaica from 1988 to 2006 -- a period that included the five years after Kevin was shot -- and never suffered violence due to his father's or brother's political associations. Furthermore, documentary evidence attested to a decline in political violence in Jamaica in recent years. Finally, Cole had testified that he could relocate within the country to

6

avoid suffering harm due to his imputed political associations. Accordingly, the IJ denied Cole all three forms of relief he sought and ordered that Cole be removed to Jamaica. Cole appealed this decision, along with the denial of his motion for a continuance, to the BIA.

## C.

On October 28, 2011, the BIA dismissed Cole's appeal and upheld most, but not all, of the IJ's decision. The BIA first decided that Cole's SCYOA conviction was a conviction for immigration purposes. The BIA reasoned that the SCYOA resulted in convictions, not civil adjudications of status, and thus was unlike juvenile delinquency proceedings, which the BIA did not treat as convictions for immigration purposes. The BIA also sustained Cole's removability pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii), but only upon the final ground in the IJ's decision: that Cole was an aggravated felon convicted of a crime of violence. The BIA, however, proceeded under a different sub-section of the relevant crime of violence definition -- that Cole's offense was one that involved a substantial risk that physical force would be used against the victim -- than the one upon which the IJ had relied. As the IJ had done, the BIA rejected Cole's argument that S.C. Code § 16-23-410 lacked a mens rea requirement.

Next, the BIA considered Cole's applications for asylum and withholding of removal. Since Cole was an aggravated felon, 8 U.S.C. § 1158(b)(2)(A)(ii) barred

7

Cole from a grant of asylum. Moreover, since BIA precedent established that his indeterminate sentence of up to five years should be treated like a five-year term of imprisonment, § 1231(b)(3)(B)(ii) barred Cole from withholding of removal. The BIA then specifically adopted the IJ's alternative decision denying Cole's application for withholding of removal due to a failure of proof. The BIA also adopted the IJ's decision denying Cole's application for CAT relief because the record did not establish that it was more likely than not that the Jamaican government, or private actors to whom officials have acquiesced, would subject Cole to torture. Accordingly, the BIA dismissed Cole's appeal with regard to the three forms of relief he sought.

Finally, the BIA rejected Cole's due process challenge to the IJ's denial of his motion for a continuance. The BIA held that there was no prejudice to Cole, because the documentary evidence sought -- which would have corroborated the existence of his disabilities, a fact not in dispute -- was not relevant to the reasons the IJ had denied his claims for relief. Cole timely appealed the BIA's decision.

## II.

We review "only the BIA's decision," except to the extent that it "expressly adopt[s] the IJ's opinion or reasoning." Imelda v. U.S. Att'y Gen., 611 F.3d 724, 727 (11th Cir. 2010). As a threshold matter, we determine the extent of our subject-matter jurisdiction de novo. Amaya-Artunduaga v. U.S. Att'y Gen., 463

8

F.3d 1247, 1250 (11th Cir. 2006). Legal and constitutional questions, which this Court always has jurisdiction to consider, receive de novo review. Poveda v. U.S. Att'y Gen., 692 F.3d 1168, 1172 (11th Cir. 2012). However, we defer to the BIA's permissible construction of ambiguous terms in the Immigration and Nationality Act ("INA") under Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984). See Poveda, 692 F.3d at 1176. To the extent we have jurisdiction to do so, we review factual determinations under the substantial evidence test. Thus, we will affirm if the BIA's decision "is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Imelda, 611 F.3d at 727 (internal quotation marks omitted). Under this standard, reversal requires finding "that the record not only supports reversal, but compels it." Id. at 728 (quoting Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003)).

A number of statutes and regulations govern this appeal. The REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, limits our jurisdiction if the petitioner's removability is predicated upon a criminal offense covered in 8 U.S.C. § 1227(a)(2)(A)(iii). See 8 U.S.C. § 1252(a)(2)(C), (D). In such cases, "no court shall have jurisdiction to review any final order of removal," § 1252(a)(2)(C), except for "review of constitutional claims or questions of law raised upon a petition for review." § 1252(a)(2)(D). "The upshot of all this is that the

9

jurisdictional question merges into our consideration of the merits." Garces. v. U.S. Att'y Gen., 611 F.3d 1337, 1343 (11th Cir. 2010). The resolution of the first two issues presented in this appeal -- whether Cole's conviction qualifies as a conviction for immigration purposes, and whether Cole's conviction was a crime of violence, and hence an aggravated felony -- will determine whether Cole is removable under 8 U.S.C. § 1227(a)(2)(A)(iii) and whether our review of Cole's remaining claims can reach factual issues or is limited to legal and constitutional questions only.

Four statutes are relevant in assessing the merits of Cole's claims. Title 8 U.S.C. § 1101(a) contains definitions of terms used throughout the INA, including "conviction," § 1101(a)(48)(A), "aggravated felony," § 1101(a)(43), and "term of imprisonment," § 1101(a)(48)(B). Section 1227(a)(2)(A)(iii) renders an alien removable for having committed an aggravated felony. Sections 1158(b)(2)(A)(ii) and (B)(i) render an alien ineligible for asylum if the basis of removability is an aggravated felony. Section 1231(b)(3)(B)(ii) renders an alien ineligible for withholding of removal if he or she has committed a "particularly serious crime," which is an aggravated felony (or felonies) for which the aggregate term of imprisonment is five years or more. Finally, 8 C.F.R. §§ 1208.16 and 1208.18 are the implementing regulations for the CAT and establish the standard for that form of relief. With this framework in mind, we turn to the substance of Cole's petition.

10

III.

A.

The threshold question is whether Cole's conviction under the SCYOA qualifies as a conviction for immigration purposes, an issue of first impression in this Circuit. Cole contends that it does not, and, if correct on this matter, Cole would not be removable. The definition of "conviction," however, clearly encompasses the SCYOA proceedings in question. The text of the statute is the beginning and the end of our inquiry, for it defines a conviction as:

> [A] formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where--
>
> (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and
>
> (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

8 U.S.C. § 1101(a)(48)(A).

The text of the statute enumerates two conditions, both of which an SCYOA conviction satisfies. Notably, the text makes no distinction based on the age of the offender or what type of proceeding results in the conviction. The statute also does not carve out any exception for convictions that come with the possibility of expungement in the future. Rather, the text compels us to treat as a conviction any formal judgment of guilt entered by a court, or any finding of guilt coupled with

11

punishment. In this case, the proceeding occurred in the Court of General Sessions, the court of general jurisdiction in South Carolina with authority over criminal matters.[1] The Court of General Sessions accepted Cole's guilty plea and sentenced him to serve an indeterminate sentence of up to five years. This act satisfied both conditions of 8 U.S.C. § 1101(a)(48)(A), since Cole "entered a plea of guilty" and "the judge . . . ordered some form of punishment." What could happen in the future -- such as the potential expungement of Cole's conviction -- is irrelevant for immigration purposes.

Two of our prior decisions have read this unambiguous statute in precisely the same way. In Resendiz-Alcaraz v. U.S. Att'y Gen., 383 F.3d 1262, 1271 (11th Cir. 2004), a panel of this Court held that an expunged conviction nonetheless qualified as a conviction for immigration purposes. The petitioner in that case had been convicted of possession of marijuana in a Missouri state court, which expunged the conviction a year later pursuant to Mo. Rev. Stat. § 610.105. Id. at 1265. In addressing whether Resendiz-Alcaraz's expunged conviction was a conviction for immigration purposes, the Court began, as we did, with the statutory definition of conviction:

---

[1] See S.C. Const. Art. V, § 11 ("The Circuit Court shall be a general trial court with original jurisdiction in civil and criminal cases . . . ."); S.C. Code § 14-1-70 ("The following are courts of justice in this State: . . . (4) the circuit courts, to wit: (a) a court of common pleas and (b) a court of general sessions . . . .").

12

> The language of § 1101(a)(48)(A) is quite clear -- an alien will be considered to have a conviction for immigration purposes if: (1) a judge or jury found the alien guilty, if the alien entered a guilty plea or a plea of nolo contendere, or if the alien admitted sufficient facts to warrant a finding of guilt; and (2) the judge ordered some form of punishment.

Id. at 1268. Much like Cole's conviction, Resendiz-Alcaraz's "state conviction satisfie[d] these conditions. He pled guilty to the possession offense and was subject to a penalty of one year probation." Id. Expungement was irrelevant, we explained, because "the statutory definition on its face appears to negate for immigration purposes the effect of state rehabilitative measures that purport to expunge or otherwise remove a conviction." Id. Thus, the Court concluded, "a state conviction is a conviction for immigration purposes, regardless of whether it is later expunged under a state rehabilitative statute, so long as it satisfies the requirements of § 1101(a)(48)(A)." Id. at 1271.

The other relevant decision from our Court is Singh v. U.S. Att'y Gen., 561 F.3d 1275 (11th Cir. 2009). In Singh, the 15-year-old petitioner pleaded guilty in Florida circuit court to several felonies, id. at 1277, and the INS sought to remove him as an alien convicted of an aggravated felony. Id. at 1278. On appeal, Singh argued that his conviction as an adult in state court could not qualify as a conviction for immigration purposes, because in the federal system the Federal Juvenile Delinquency Act ("FJDA") would have treated a non-violent 15-year-old offender as a juvenile delinquent. Id. at 1278-79. The panel in Singh recited the

13

relevant definition of conviction from 8 U.S.C. § 1101(a)(48)(A) and then examined the holdings of three other Courts of Appeals, which all determined that the clear and unambiguous definition of conviction included a minor's state conviction as an adult. See id. at 1279 (citing Savchuck v. Mukasey, 518 F.3d 119, 122 (2d Cir. 2008); Vargas-Hernandez v. Gonzales, 497 F.3d 919, 922-23 (9th Cir. 2007); Vieira Garcia v. INS, 239 F.3d 409, 413-14 (1st Cir. 2001)). Singh therefore concluded:

> We follow the plain reading of § 1101(a)(48)(A), as well as the First, Second, and Ninth Circuits, and hold that Singh's conviction as an adult in Florida court is a conviction for immigration purposes, even though he was a minor at the time.

Id.

Resendiz-Alcaraz and Singh establish that, standing alone, neither the possibility of expungement nor the age of the offender are relevant in determining whether a conviction in a criminal court of general jurisdiction qualifies as a conviction for immigration purposes. Since both are premised upon a plain reading of § 1101(a)(48)(A)'s text, we can discern no reason why those two factors taken together could yield a different result. The definition of conviction simply makes no exception for convictions that condition the possibility of expungement on the age of the offender; indeed, it makes no exceptions at all and encompasses all guilty pleas coupled with court-imposed punishment. See also Dung Phan v. Holder, 667 F.3d 448 (4th Cir. 2012) (an expunged conviction under the District of

14

Columbia Youth Rehabilitation Act constituted a conviction for immigration purposes).

Indeed, even if we were to look at the legislative history of the Illegal Immigration Reform & Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, it would only reinforce our interpretation of the text. Congress intended for an alien's conviction to count as a conviction as soon as the original judgment or finding of guilt occurred, regardless of subsequent events such as expungement or suspension of sentence. See H.R. Rep. 104-828, at 224 (1996) (Conf. Rep.). The report explains that the revised definition "deliberately broaden[ed] the scope of the definition of 'conviction'" so that the federal meaning of "conviction" would be unaffected by the states' "myriad of provisions for ameliorating the effects of a [state] conviction." Id. This provision "clarifie[d] Congressional intent that even in cases where adjudication is 'deferred,' the original finding or confession of guilt is sufficient to establish a 'conviction' for purposes of the immigration laws." Id. This passage confirms the irrelevance of the fact that the South Carolina court may expunge Cole's sentence.

Thus, we end where we began, with the clear and unambiguous command of 8 U.S.C. § 1101(a)(48)(A) that a guilty plea combined with a court-imposed

punishment constitutes a conviction for immigration purposes.[2] Under

§ 1101(a)(48)(A), Cole's SCYOA conviction is a conviction for immigration

purposes, and his argument to the contrary can find no purchase in the text or the

history of this provision. Having resolved this basic question, we turn to whether

Cole is removable because of this conviction.

### B.

Cole contends that his conviction under S.C. Code § 16-23-410 is not a

crime of violence, the type of aggravated felony for which the BIA found him

removable. Whether S.C. Code § 16-23-410 is a crime of violence is also an issue

of first impression in this Circuit. We hold that this offense is a crime of violence,

and therefore the BIA properly found Cole removable under 8 U.S.C.

§ 1227(a)(2)(A)(iii). Our holding renders Cole ineligible for asylum under

§ 1158(b)(2)(A)(ii), and our jurisdiction over his remaining claims is limited to

legal and constitutional questions pursuant to § 1252(a)(2)(C) and (D).

Section 1227(a)(2)(A)(iii) states, "Any alien who is convicted of an

aggravated felony at any time after admission is deportable." The term "aggravated

felony" is defined to include, inter alia, "a crime of violence (as defined in section

---

[2] Our holding does not call into question the BIA's precedent in In re Devison, 22 I. & N. Dec. 1362 (B.I.A. 2000). In that case, the BIA held that state proceedings analogous to the Federal Juvenile Delinquency Act did not produce convictions for immigration purposes. Id. at 1366-68. Juvenile delinquency proceedings, unlike the South Carolina Youthful Offender Act, result in "the adjudication of a status rather than" the guilt or innocence of a crime and "are civil in nature." Id. at 1366. For this reason, they do not satisfy 8 U.S.C. § 1101(a)(48)(A)'s definition of conviction.

16 of Title 18 . . . ) for which the term of imprisonment [is] at least one year." 8

U.S.C. § 1101(a)(43)(F). That section directs us to the following definition:

> The term "crime of violence" means--
>
> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.

To determine whether a state law offense qualifies as a crime of violence for immigration purposes, we employ a categorical approach, looking to the "elements and the nature of the offense of conviction, rather than to the particular facts relating to petitioner's crime." Leocal v. Ashcroft, 543 U.S. 1, 7, 125 S. Ct. 377 (2004); see also Hernandez v. U.S. Att'y Gen., 513 F.3d 1336, 1339 (11th Cir. 2008). As a federal court analyzing a state law offense, we are bound by the state supreme court's interpretation of state law, "including its determination of the elements" of a crime. See Johnson v. United States, 130 S. Ct. 1265, 1269 (2010). In instances when the state supreme court has not definitively ruled, we "are bound by decisions of a state's intermediate appellate courts unless there is persuasive evidence that the highest state court would rule otherwise." Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1133 (11th Cir. 2010) (internal quotation marks

omitted); see also United States v. King, 673 F.3d 274, 279-80 (4th Cir. 2012) (applying this approach to S.C. Code § 16-23-410 and finding it a crime of violence for sentencing purposes).

In light of Leocal, we ask whether the state law offense contains a mens rea greater than negligent conduct. 543 U.S. at 9-11. Leocal reviewed a decision of this Court holding that Fla. Stat. § 316.193(3)(c)(2), which criminalized driving under the influence of alcohol and causing serious bodily injury, was a crime of violence under 18 U.S.C. § 16. Id. at 3-4. The Supreme Court began with the statutory language, stating "[t]he critical aspect of § 16(a) is that a crime of violence is one involving the 'use . . . of physical force against the person or property of another. (Emphasis added.)" Id. at 9. Use against another implies "active employment," and "naturally suggests a higher degree of intent than negligent or merely accidental conduct." Id. Therefore, the Supreme Court reasoned, the Florida offense, which incorporated no mens rea, see id. at 7-8, could not be a crime of violence under § 16(a). Id. at 10.

The Court then turned to § 16(b) and gave it an analogous construction: "§ 16(b) does not . . . encompass all negligent misconduct . . . . It simply covers offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." Id. In short, the "substantial risk that physical force . . . may be used" is not equivalent to "the

18

possibility that harm will result from a person's conduct, but to the risk that the use of physical force against another might be required in committing a crime." Id. The Court offered burglary as the paradigmatic example: "A burglary would be covered under § 16(b) not because the offense can be committed in a generally reckless way or because someone may be injured, but because burglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime." Id. Thus, the Court gave "the language in § 16(b) an identical construction, requiring a higher mens rea than the merely accidental or negligent conduct involved in a DUI offense." Id. at 11.

On its face, S.C. Code § 16-23-410 states only, "It is unlawful for a person to present or point at another person a loaded or unloaded firearm," with exceptions for theatrical performances and self-defense not pertinent to the present case. The Supreme Court of South Carolina has interpreted the statute as having three distinct elements: "(1) pointing or presenting; (2) a loaded or unloaded firearm; (3) at another." State v. Burton, 589 S.E.2d 6, 8 (S.C. 2003). Thus, on first viewing, it seems possible that this offense fails to meet Leocal's mens rea requirement. However, South Carolina's Court of Appeals subsequently held that the term "presenting" means "showing or displaying a firearm in a threatening or menacing manner" and hence requires an intentional mens rea. In re Spencer, 692 S.E.2d 569, 572 (S.C. Ct. App. 2010); see also id. at 573 n.2 ("Thus, the State must

19

offer direct or circumstantial evidence that a person specifically intended to present a firearm <u>at</u> someone before a conviction may be sustained."). Since this interpretation of the active verb is consistent with the South Carolina Supreme Court's decision in <u>Burton</u>, we are bound by the Court of Appeals's interpretation of the offense.

The BIA correctly determined that S.C. Code § 16-23-410 qualifies as a crime of violence under 18 U.S.C. § 16(b). As South Carolina's courts have interpreted S.C. Code § 16-23-410, the offense has as an element an intentional mens rea and thus satisfies <u>Leocal</u>'s intent requirement. Moreover, there is a substantial risk that the act of pointing a firearm at another will provoke the sort of confrontation that leads to the intentional use of physical force. In <u>Leocal</u>, the Supreme Court categorized burglary as a § 16(b) offense because, although it did not have as an element the use of force, the ordinary commission of burglary carries with it the risk that a perpetrator will encounter his or her victim, precipitating a confrontation involving intentional force. <u>See</u> <u>Leocal</u>, 543 U.S. at 10; <u>see also</u> <u>James v. United States</u>, 550 U.S. 192, 203-04 (2007) ("The main risk of burglary arises not from the simple physical act of wrongfully entering onto another's property, but rather from the possibility of a face-to-face confrontation between the burglar and a third party -- whether the occupant, a police officer, or a bystander -- who comes to investigate."). This risk is all the more apparent in this

case, where the crime itself necessarily involves an encounter with the victim. Common sense teaches us that such an encounter -- in which the perpetrator points or presents a firearm threateningly at the victim -- carries a substantial risk the confrontation will result in the use of intentional force.

Indeed, before Leocal, the Fourth Circuit had already decided that S.C. Code § 16-23-410 constituted a crime of violence under 18 U.S.C. § 16(b). See United States v. Thompson, 891 F.2d 507, 509 (4th Cir. 1989). Although Thompson did not have the benefit of Leocal's guidance, it remains persuasive. Examining South Carolina state cases, the Fourth Circuit found that "[i]n each of the reported South Carolina cases, the pointing of a firearm at another person was accompanied by the use of physical force." Id. at 509 (citing various state cases in which the offense was accompanied by actually firing the weapon). Thus, the substantial risk that accompanies a violation of S.C. Code § 16-23-410 springs not from general recklessness but from the fact that "by its nature," it "involves a substantial risk" that the perpetrator "will use force against a victim." See Leocal, 543 U.S. at 10.

Cole's arguments to the contrary are unavailing. Cole has placed great weight on the fact that the statute criminalized pointing even with an "unloaded firearm." S.C. Code § 16-23-410. However, merely being unloaded does not render a firearm non-threatening. A victim of this offense cannot be expected to know that the firearm pointed at them is unloaded; nor could that victim reasonably be

21

expected, in the heat of the moment, to react less rashly to the threat. Thus, under 18 U.S.C. § 16(b), the fact remains that threatening another person even with an unloaded firearm is likely to lead to a physical confrontation involving intentional force. The only difference would be the type of force eventually utilized in such a confrontation, since the perpetrator would not be able to actually shoot his or her victim. Leocal itself considered burglary the quintessential § 16(b) crime of violence, see 526 U.S. at 10, although a burglar need not carry a loaded weapon, or indeed any weapon at all. In this case as well, the risk of violence stems from the confrontational nature of the offense, not the fact that the gun involved may be loaded or unloaded.

Cole also argues that pointing a firearm and presenting it are two distinct ways to violate S.C. Code § 16-23-410, and that In re Spencer directly addressed only the meaning of the term "presenting." Following Cole's chain of reasoning, only presenting has an intentional mens rea and the element of threatening another. However, this argument belies the reasoning of In re Spencer itself, which states that similar state statutes "prohibit not only the overt action of pointing or directing a firearm at someone, but also the more passive action of showing or displaying a firearm in a threatening or menacing manner." 692 S.E.2d at 572. The natural conclusion is that pointing is also an intentional or "overt" act. Indeed, the decision implies that, if anything, pointing is the more obviously threatening and intentional

22

act. The Fourth Circuit has endorsed this view when interpreting the elements of the offense. See King, 673 F.3d at 280 n.4 ("[T]he two disjunctively worded terms stand on equal footing by both requiring threatening behavior."). Thus, we are unpersuaded by Cole's attempt to distinguish the statute's two active verbs, and we hold that Cole's offense of pointing a firearm at another is a crime of violence.

There are three significant consequences to this determination. First, pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) and the definition of aggravated felony in § 1101(a)(43)(F), the BIA correctly determined that Cole was a removable alien. Second, under § 1158(b)(2)(A)(ii), asylum is unavailable to Cole because, "having been convicted by a final judgment of a particularly serious crime," he "constitutes a danger to the community of the United States."[3] Finally, we review Cole's remaining claims -- for withholding of removal and CAT relief -- only insofar as they state legal and constitutional claims. See § 1252(a)(2)(C), (D).

## C.

The third issue Cole has raised is whether he is eligible for withholding of removal, or whether 8 U.S.C. § 1231(b)(3)(B)(ii) bars Cole from that form of relief. We hold that it does, because he was sentenced to an indeterminate term of imprisonment of up to five years.

---

[3] A "particularly serious crime" in the asylum context is synonymous with conviction of an aggravated felony. See § 1158(b)(2)(B)(i) ("For purposes of clause (ii) of subparagraph (A), an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime.").

The relevant INA provision states:

Subparagraph (A) [regarding withholding of removal] does not apply to an alien . . . if the Attorney General decides that--

. . .

(ii) the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States;

. . . .

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.

§ 1231(b)(3)(B). Simply stated, this subsection gives the Attorney General discretion to deny withholding of removal to otherwise qualified aliens if they have committed what the Attorney General deems to be a particularly serious crime. When, however, an alien has committed an aggravated felony or felonies, and the aggregate term of imprisonment is five years or more, the Attorney General has no discretion, and the statute automatically bars the alien from withholding of removal. United States v. Maung, 320 F.3d 1305, 1307 n.1 (11th Cir. 2003).

The INA defines a term of imprisonment this way: "Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any

24

suspension of the imposition or execution of that imprisonment or sentence in whole or in part." 8 U.S.C. § 1101(a)(48)(B). The critical question is yet another issue of first impression: whether an indeterminate sentence under the SCYOA, for a maximum term of up to five years, ought to be construed as a five-year term of imprisonment for immigration purposes.

Initially, the government disputes whether Cole adequately raised this argument in his brief. A party adequately raises an issue when the party "specifically and clearly identified" it in its opening brief; otherwise, the claim will be "deemed abandoned and its merits will not be addressed." Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004). To adequately raise a claim or issue, a party "must plainly and prominently so indicate," for instance by "devot[ing] a discrete section of his argument to" those claims. United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003). If the party mentions the issue only in his Statement of the Case but does not elaborate further in the Argument section, the party has abandoned that issue. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989). Cole did not abandon this issue. Initially, in the Summary of Argument, Cole lists as a discrete issue, "Whether the Respondent erred in determining that the Petitioner's conviction was a particularly serious crime rendering Petitioner ineligible for Withholding Of Removal?" Unlike the abandoned argument in Greenbriar, this argument reappears

25

as a discrete issue in Cole's Argument section. Labeled 4.B.1., "Particularly Serious Crime," this sub-section asserts that "notwithstanding the Board's prior determination regarding indeterminate sentencing, the question of whether an offense is a particularly serious crime is one of discretion." The brief further argues: "Indeterminate sentences imposed under the provisions of the youthful offender process cannot be deemed to be the same as indeterminate sentences imposed for adult criminal offenders." Although inelegantly stated, the essence of Cole's argument seems to be that his indeterminate sentence under the SCYOA is not a five-year sentence for immigration purposes.

For several decades, the BIA has measured all indeterminate sentences by their maximum possible term, see In re S-S-, 21 I. & N. Dec. 900, 902-03 (B.I.A. 1997), and there is a circuit split regarding whether this rule merits Chevron deference. In Nguyen v. INS, 53 F.3d 310 (10th Cir. 1995), the Tenth Circuit deferred to the BIA's rule. Nguyen explained that this interpretation was "permissible," in large part because it "accord[ed] with the Sentencing Guidelines' rationale that the term 'sentence of imprisonment' refers to the maximum sentence imposed." See id. at 311 (internal quotation marks omitted) (citing U.S.S.G. § 4A1.2(b)(1), whose commentary explains that "in the case of an indeterminate sentence of one to five years, the stated maximum is five years . . . .").

26

In <u>Shaya v. Holder</u>, 586 F.3d 401 (6th Cir. 2009), on the other hand, the Sixth Circuit denied this longstanding rule deference. <u>Shaya</u> confronted Michigan's idiosyncratic sentencing scheme, which denied the state courts discretion in setting the maximum term for an indeterminate sentence and instead obligated the courts to set the maximum penalty provided by the law as the maximum term. <u>See</u> <u>id.</u> at 406. The Sixth Circuit reasoned that "determining the length of [a] sentence is less an exercise in interpreting the INA provision than it is interpreting state sentencing law," <u>id.</u>, and noted that the BIA's own decisions establishing this rule had been decided based on their reading of the relevant state laws. <u>Shaya</u> thus concluded that "these kinds of [state law] determinations by the BIA are not entitled to <u>Chevron</u> deference," and conducted its own examination of Michigan law to determine how to measure an indeterminate sentence. <u>Id.</u> at 406-08.

The Sixth Circuit's reasoning casts doubt on whether we should defer to the BIA rule in this case, since <u>Chevron</u> deference applies only to "an agency's construction of the statute which it administers." <u>Chevron</u>, 467 U.S. at 842. In this case, however, we need not decide between these two competing approaches. If we follow <u>Shaya</u> and examine South Carolina state law, then Cole's indeterminate sentence under the SCYOA should be treated as a five-year sentence. The Supreme Court of South Carolina recently addressed whether a paroled convict's six-year

27

indefinite term of imprisonment pursuant to the SCYOA had ended with his conditional release or at the end of the full six-year term. State v. Ellis, 726 S.E.2d 5, 5-7 (S.C. 2012). Ellis reaffirmed that South Carolina law treats "[p]robation, a suspension of the period of incarceration . . . [and] actual incarceration" as "clearly part of a criminal defendant's 'term of imprisonment.'" Id. at 7 (citing Thompson v. S.C. Dep't of Pub. Safety, 515 S.E.2d 761, 763 (S.C. 1999)). Thus, the highest court of the state has construed the term of imprisonment for a SCYOA indeterminate sentence as the maximum possible term, even if the individual is actually released from incarceration significantly earlier. On the other hand, if we follow Nguyen and defer to the BIA, the same result obtains under longstanding BIA precedent.

Thus, we conclude that Cole's indeterminate five-year SCYOA sentence constitutes a five-year sentence pursuant to 8 U.S.C. § 1231(b)(3)(B). As a consequence, Cole is "automatically deemed to have committed a particularly serious crime," Maung, 320 F.3d at 1307 n.1 (internal quotation marks omitted), and is statutorily ineligible for withholding of removal. Therefore, the only remaining form of immigration relief available to Cole would be relief under the United Nations Convention Against Torture.

D.

The Convention Against Torture states that signatory nations will not "expel, return or extradite a person to another State where there are substantial grounds for believing he would be in danger of being subjected to torture." United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Art. 3(1), Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85. The Convention's implementing legislation, the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681, in turn directed "the heads of the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT]." See 8 U.S.C. § 1231 note. Under the relevant regulations, Cole is eligible for relief if he can establish that it is "more likely than not that he . . . would be tortured if removed." 8 C.F.R. § 1208.16(c)(2). The regulations further define torture as

> any act by which severe pain or suffering . . . is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

§ 1208.18(a)(1).

We are mindful that 8 U.S.C. § 1252(a)(2)(D) restricts our review here to Cole's legal and constitutional claims. This does not mean, however, that we are

29

without power to examine the BIA's denial of Cole's torture claims. We have held that a CAT determination is a mixed question of law and fact, and that the legal component of that mixed question is subject to our scrutiny. See Jean-Pierre v. U.S. Att'y Gen., 500 F.3d 1315, 1322 (11th Cir. 2007). In Jean-Pierre, we considered a petition from an AIDS patient who alleged that, if removed to Haiti, he would be "beaten with metal rods, confined for weeks in a tiny crawl space, and subjected to . . . 'kalot marassa' (severe boxing of the ears)." Id. at 1317. The BIA denied his application for CAT relief in an opinion that acknowledged the likelihood of the harms Jean-Pierre alleged would occur but denied that such treatment amounted to torture. See id. at 1320. At issue in the case was whether we had any jurisdiction to review Jean-Pierre's petition under 8 U.S.C. § 1252(a)(2)(C) and (D). Under pre-REAL ID Act case law, this Court had "held that habeas corpus jurisdiction extend[ed] to the adjudication of mixed questions of law and fact, including the question of whether a particular course of conduct (fact) constitutes torture (law)." See id. at 1321 (citing Cadet v. Bulger, 377 F.3d 1173, 1184 (11th Cir. 2004)). We then interpreted the REAL ID Act as changing the proper review mechanism -- that is, eliminating habeas jurisdiction and making "the exclusive mechanism for judicial review . . . a petition for review filed with the appropriate court of appeals," id., but further reasoned that "[w]hile the mechanism changed, however, the scope of our review of the law did not." Id. This

30

Court therefore has the limited but significant jurisdiction to review the application of the "CAT's legal definition of 'torture' to the facts of what [would] happen" to the petitioner. Id. at 1322 (internal quotation marks omitted).

With that framework in mind, we turn to the BIA's and IJ's determinations in this case.[4] The following determinations are factual in nature and hence unreviewable. With regard to Cole's claim that persons with physical or mental disabilities are tortured in Jamaica, the IJ found, to the contrary, that "the Jamaican government is taking commendable steps to actively combat the marginalization of persons with disabilities in the country." The IJ therefore found that Cole had "not shown that there is even a possibility that he will be tortured with the acquiescence of the government."

As for Cole's second claim that deportees are tortured upon their return to Jamaica, the IJ did not find substantial evidence in the record to indicate that the Jamaican government tortured aliens removed to Jamaica. Rather, the IJ found that the government has taken specific steps to identify dangerous deportees rather than discriminating against the group as a whole. In addition, "[t]he Jamaican police seek approval from the Jamaican Supreme Court before the organization monitors deportees that it feels present a threat to the community."

---

[4] Since the BIA adopted the IJ's reasoning denying CAT relief, we review the IJ's decision. Imelda, 611 F.3d at 727.

31

Finally, regarding Cole's claim he would be targeted based on imputed political association, the IJ found that Cole had not established it was more likely than not that he would suffer violent reprisal due to his father's or brother's ties to the PNP. The IJ based this determination on several facts. Cole lived in Jamaica from 1988 to 2006 -- a time period that included five years after his brother Kevin was shot in a politically motivated attack -- and was never the target of politically motivated violence. Furthermore, documentary evidence attested to a recent decline in political violence in Jamaica. In addition, Cole had testified that he could relocate within the country. We take these facts as given for purposes of our review.

These factual findings undercut two of Cole's claims completely. First, we cannot review the BIA's decision that Cole would not be tortured based on his disabilities, because the decision is sustainable solely based on the IJ's factual finding that the Jamaican government actively combats marginalization of the disabled. See Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1242 (11th Cir. 2004) (acquiescence requires that a public official, prior to the activity constituting torture, have awareness of that activity and then breach a legal responsibility to intervene to prevent that activity). Second, we cannot review the BIA's decision that Cole would not be tortured based on imputed political opinion. The likelihood of future harm is a factual question, see Jean-Pierre, 500 F.3d at 1322; Zhou Hua

32

Zhu v. U.S. Att'y Gen., 703 F.3d 1303, 1310-14 (11th Cir. 2013), which the IJ determined in this case to be improbable.

We do have the power to review the IJ's resolution of Cole's deportee claim. Regarding that claim, the IJ found that the more severe harms alleged by Cole were unlikely to occur. However, the IJ then held that, assuming arguendo that Cole's allegations of temporary detention were true, they still fell short of the legal threshold for torture established by this Circuit. This portion of the holding was based on a legal conclusion that temporary detention did not constitute torture rather than a factual determination. After careful consideration, we hold that the alleged harms -- temporary detention at "Central," where deportees are processed and then released into the community -- fall short of the conduct we and our sister Circuits have treated as torture.

In Jean-Pierre, as we have noted, the petitioner was an AIDS patient who demonstrated that he would be beaten and confined for weeks in a tiny crawl space, 500 F.3d at 1317, and that he would be targeted due to his disease, id. at 1318. Other circuits have also held that detention plus egregious physical abuse or intentional infliction of suffering may amount to torture. See, e.g., Kang v. Att'y Gen. of the U.S., 611 F.3d 157, 166-67 (3d Cir. 2010) (petitioner was entitled to CAT relief when "[t]he record compels the conclusion that if Kang is removed to China it is more likely than not that she will be beaten, suffocated, deprived of

33

sleep, shocked with electrical current, and/or forced to stand for long periods of time, and that this would be done with the purpose of causing her severe pain and suffering"). These examples far outstrip what Cole has alleged with regard to "Central" detention in this case. Unlike in Jean-Pierre or Kang, neither the IJ nor the BIA found that Cole would suffer such egregious physical abuse, or anything even remotely like that. The BIA's determination to this effect does not constitute legal error.

Cole's remaining arguments are unavailing, since they contest the weight and significance given to various pieces of evidence, which we lack jurisdiction to review. To the extent Cole's claim is a legal one asserting the BIA and IJ failed to provide a reasoned explanation of its decision, it is well established that "the IJ and the BIA need not address specifically each claim the petitioner made or each piece of evidence the petitioner presented"; they need only "consider the issues raised and announce their decision in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." Carrizo v. U.S. Att'y Gen., 652 F.3d 1326, 1332 (11th Cir. 2011) (internal quotation marks omitted). The IJ's thorough, twenty-three-page opinion, and the BIA's five-page affirmation, fully meet this threshold. Thus, the BIA and the IJ properly denied Cole CAT relief.

E.

34

Finally, Cole argues that the IJ's denial of his motion for a continuance violated his right to due process, because he was unable to obtain additional documentary evidence proving his disabilities and difficulties in school in Jamaica. To demonstrate a constitutional violation, Cole must establish that he "was deprived of liberty without due process of law and that the purported errors caused [him] substantial prejudice." Lapaix v. U.S. Att'y Gen., 605 F.3d 1138, 1143 (11th Cir. 2010). Substantial prejudice means that "in the absence of the alleged violations, the outcome of the proceeding would have been different." Id. (citing Ibrahim v. INS, 821 F.2d 1547, 1550 (11th Cir. 1987)).

Cole has not shown substantial prejudice in this case. The pieces of evidence he sought were primarily "school and doctor's records" from his life in Jamaica, as well as "vital statistics documents in the possession of governmental entities." However, Cole has failed to explain how these documents would enhance his ability to meet his burden of proof, as he asserts. The IJ found Cole's testimony, along with that of his mother and his sister, to be credible, and never denied Cole's disabilities. Thus, the documents in question were cumulative. Rather than rejecting Cole's application on these grounds, the IJ primarily denied Cole's application for relief on legal grounds, such as his statutory ineligibility for asylum or withholding of removal. And the IJ's factual findings would not have been called into question by additional evidence of Cole's disabilities. Cole has not

35

established his due process rights were violated by the IJ's denial of his motion for a continuance.

We, therefore, conclude that none of Cole's claims justify granting his petition.


PETITION DENIED.